IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHRISTA TAMA KUEHL,

        Plaintiff,

v.

NANCY BERRYHILL,
Acting Commissioner, Social Security Administration,

        Defendant.

OPINION & ORDER

18-cv-69-jdp

---

Plaintiff Christa Tama Kuehl seeks judicial review of a final decision of defendant Nancy Berryhill, Acting Commissioner of Social Security, finding Kuehl not disabled under the Social Security Act. Kuehl contends that the administrative law judge (ALJ) erred by: (1) failing to give proper weight to the opinions of Kuehl's treating and examining physicians; and (2) failing to consider Kuehl's moderate limitations in concentration, persistence, and pace in determining her residual functional capacity (RFC).

The case is scheduled for an oral argument on October 5, 2018, but the court concludes that no oral argument is needed in light of the relatively straightforward nature of the claims. The court agrees with Kuehl that the ALJ failed to provide good reasons to support his decision to weight the opinions of non-examining agency psychologists over those of Kuehl's treating and examining physicians. Further, the ALJ failed to provide sufficient basis for his determination of Kuehl's RFC in light of Kuehl's limitations in concentration, persistence, and pace. As a result, the ALJ's assessment of Kuehl's RFC is not supported by substantial evidence. The court will therefore remand the case for further proceedings.

BACKGROUND

Kuehl is diagnosed with schizoaffective disorder, bipolar type; depression; and anxiety. In the 15 years prior to her disability hearing in June 2016, she left or was fired from more than a dozen jobs—losses she attributes to the debilitating workplace anxiety and panic attacks she suffers as a result of her diagnoses. **R. 246**.[1] Kuehl applied for social security benefits on October 10, 2013, alleging a disability onset date of August 12, 2013. Her claim was denied both initially and upon reconsideration, so she filed a written request for a hearing, which was held before ALJ William Leland on June 29, 2016. The ALJ determined that, despite her impairments, Kuehl retained the capacity to perform a significant number of jobs in the economy.[2] The Appeals Council affirmed the ALJ's decision.

Kuehl now appeals, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C § 405(g). She objects to the ALJ's decision to give significant weight to the opinions of reviewing psychologists who examined only a sliver of her overall medical record, while discounting the opinions of her treating and examining physicians who reviewed a much more substantial record. She alleges that the ALJ cherry-picked the record in an effort to portray her treating psychologist's treatment notes as internally inconsistent, and that he placed outsized importance on the unremarkable mental status examinations conducted during treatment appointments. She also challenges the ALJ's assessment of her RFC determination as failing sufficiently to incorporate his finding that she had moderate limitations in concentration, persistence, or pace.

---

[1] Record cites are to the administrative transcript, located at Dkt. 7.

[2] The ALJ also considered physical limitations related to Kuehl's hypertension and obesity, but Kuehl is not challenging the ALJ's handling of those issues.

A. **Medical record**

   1. Treatment notes

The earliest set of medical records, which dates from July 2012 through October 2013 and consists of only 25 pages, indicates that Kuehl had been receiving psychiatric treatment since 1999, **R. 251**, and had been on and off medication for anxiety, depression, and bipolar affective disorder. **R. 250–51**. (Notes from Kuehl's first ten years of psychiatric treatment are not in the record). In medical progress notes from August 2013, Kuehl's primary care provider, Dr. Clarissa Renken, noted that Kuehl had characterized herself as "so depressed that she has been having some difficulty at working completing her job," **R. 251**, and recommended that she take a minimum three-week leave of absence from work until her mental status stabilized. **R. 252**.

The most comprehensive treatment notes in the record come from Kuehl's treating psychologist, Dr. Jay Cleve, and psychiatrist, Dr. Babalu Opaneye. Both Dr. Cleve and Dr. Opaneye began treating Kuehl in October 2014, and their treatment notes span more than a year and a half. **R. 301–39; 357–402**. Dr. Cleve conducted 19 separate 52-minute psychotherapy sessions with Kuehl. The mental status examination section of his treatment notes frequently describe Kuehl as "[c]lear, lucid, articulate"; "oriented" to person, place, time, and situation, well-groomed and appropriately dressed with "[n]o suicidal ideation" or "indication of a thought disorder." **R. 308, 312, 314, 321**. But in other portions of his notes, he describes an apparent worsening of symptoms. In the spring of 2015, he described Kuehl as "very anxious," "extremely depressed," and "immobilized." **R. 357**. A few weeks later, his notes indicate that Kuehl began missing therapy appointments because of her mounting anxiety around driving. **R. 359**. In early 2016, Dr. Cleve describes Kuehl as "really having a hard time,"

"sit[ting] on the couch all day," "shower[ing] only about once a week," and "only brush[ing] her teeth about every third day." **R. 386**. He expressed uncertainty about her prospects for improvement, noting that it was "unclear a[s] to whether our session[s] will help her attempt to break the pattern" of immobilization and dysfunction. *Id.*

Dr. Opaneye met with Kuehl over the course of ten 25- to 40-minute sessions between October 2014 and April 2016. During this time, he adjusted Kuehl's medications several times. **R. 301–2; 314–15; 321–22**. In the mental status examination sections of his treatment notes, Dr. Opaneye repeatedly refers to Kuehl as alert; oriented to person, place, time, and situation; having functionally intact attention and concentration; having a coherent and logical thought process; having fair to good insight; having fair to good judgment; and having good grooming and hygiene. **R. 317, 324–25, 332–33, 363**. In October 2014, he assigned her a global assessment of functioning (GAF) score of 50 to 55, indicating that she exhibited moderate symptoms. **R. 305**. In the spring of 2015, Kuehl began reporting "persistent catastrophic preoccupation" with hypothetical tragic accidents befalling her family members. **R. 362**. She also reported experiencing "thought blocking when she is in conversation with people," a phenomenon that occurs when a person stops speaking abruptly in the middle of a thought, and which Dr. Opaneye characterized as "an indication of psychosis or worsening bipolarity." *Id.* Although Kuehl reported significant improvement in her mood and anxiety symptoms in December 2015, **R. 377**, Dr. Opaneye's notes from April 2016 show Kuehl describing herself as "increasingly depressed, amotivated and anxious" and as neglecting to bathe for up to a week at a time. **R. 397**.

2. Medical opinions

In addition to treatment notes, the record contains medical opinions from two reviewing sources, one examining source, and one treating source.[3] These opinions were produced over a two-and-a-half-year period and are discussed in chronological order.

The earliest opinion in the record was submitted by Dr. Roger Rattan, a reviewing agency psychologist who evaluated Kuehl's mental health records on behalf of the state agency at the initial stage of the Social Security disability determination process in December 2013—almost a year before Kuehl began treatment with Drs. Cleve and Opaneye. Because records of her ten years of prior psychiatric treatment were not provided, Dr. Rattan's review was limited to self-assessment worksheets and a work history filled out by Kuehl, and the 25 pages of treatment notes provided by Dr. Renken, Kuehl's primary care provider. **R. 69–70**.

In his Disability Determination Explanation, dated December 26, 2013, Dr. Rattan summarized Dr. Renken's treatment notes, **R. 70**, giving them "some but not great weight" because they concerned a time period in which Kuehl "was getting back on meds after quitting them [against medical advice]." **R. 72**. He assessed Kuehl as "partially credible," opining that her "description of memory and concentration loss is far greater than evidence suggests," *id.*, but he did not identify what that evidence was. Dr. Rattan ultimately concluded that Kuehl's understanding and memory "may be moderately impaired" and her concentration and persistence would "likely . . . be moderately impaired" as a result of her depression and anxiety

---

[3] Kuehl argues that the ALJ should have considered Dr. Opaneye's treatment notes as a second treating source opinion. Dkt. 13, at 12–14. For reasons discussed below, the court does not believe Dr. Opaneye's notes constitute a "medical opinion" within the meaning of 20 C.F.R. § 404.1527(a)(1).

symptoms. **R. 73, 74**. Although he noted that Kuehl would be limited to unskilled work because of her impairments, he found her not disabled. **R. 75–76**.

The next opinion came from Dr. Gregory Cowan, a consultative examining psychologist who examined Kuehl at the agency's request in May of 2014. Dr. Cowan reviewed Dr. Renken's clinical notes and Kuehl's own self-assessment and personally examined Kuehl for 60 minutes. He produced a Disability Psychological Report on May 28, 2014 summarizing his findings. **R. 276–83**. In it, Dr. Cowan opined that Kuehl's "ability to respond appropriately to supervisors and coworkers is mildly impaired" and that her "[c]oncentration and attention are unimpaired," but that her "[a]bility to withstand routine work stresses is markedly to extremely impaired." **R. 281**. Dr. Cowan found that Kuehl exhibited "no indication of active thought disorder"; that her speech was "relevant, goal-directed, and consistent with the topics at hand"; that she was "oriented to month, day, year, and place"; that her long-term memory, recent memory, and concentration were good; and that her insight and judgment appeared fair. **R. 279–80**. Even so, he assigned her a GAF score of 49, indicating that she exhibited serious symptoms. **R. 282**.

The next opinion is the Disability Determination Explanation completed on reconsideration by reviewing agency psychologist Dr. Ellen Rozenfeld on June 9, 2014. **R. 77–89**. Dr. Rozenfeld examined the same records considered by Dr. Rattan, as well as the Consultive Examination performed by Dr. Cowan. **R. 78–81**. In her report, Dr. Rozenfeld largely recapitulated Dr. Rattan's findings, but she noted in addition that Kuehl retained the ability "to perform simple repetitive tasks on a sustained basis in a work setting with occasional work place changes." **R. 86**. She concluded that, although Kuehl was limited to unskilled work because of her impairments, she was not disabled. **R. 87–88**.

6

The most recent medical opinion in the record is a six-page report from Dr. Cleve, which he wrote on February 2, 2015, **R. 295**, and re-affirmed in a short, handwritten note on May 19, 2016. **R. 341**. Dr. Cleve based his findings on his psychotherapy sessions with Kuehl, her prior psychiatric history, clinical notes from Dr. Opaneye, and results of three psychological tests. **R. 296–99**. His report documents Kuehl's history of suicide attempts and suicidal ideation, psychiatric hospitalizations, childhood sexual abuse, self-harm, visible and auditory hallucinations, bouts of mania, and prolonged depressive episodes. **R. 294–95**. He described her as "very unstable and quite dysfunctional," toggling between manic states characterized by "racing thoughts, agitation, irritability, disorganization, and confusion" and depressions that "slow her down, impair her memory and ability to attend and focus, and undermine her efforts to remain organized." **R. 296**.

Dr. Cleve also performed a battery of psychological assessments on Kuehl. Kuehl's scores on the Minnesota Multiphasic Personality Inventory-2 (MMPI) confirmed to Dr. Cleve that she was suffering from "some type of schizophrenia." **R. 297**. Her Millon Clinical-Multiaxial Inventory-III (MCMI) profile suggested "personality disorganization," a "failure to develop adequate internal cohesion and adequate coping skills," and a defective "foundation for effective intrapsychic regulation and socially acceptable interpersonal conduct." *Id.*

Dr. Cleve also had Kuehl complete a series of figure drawings, which he determined were indicative of "an individual who experiences an extreme sense of depersonalization." **R. 298**. He did not offer conclusions concerning specific work-related limitations, but rather stated that Kuehl's "anxiety, depression, fearfulness, but especially her bipolar mood swings from deep depression to agitated mania along with the auditory and visual hallucinations,

7

impaired mental faculties (memory, concentration, focus, ability to organize, etc.) make it impossible for her to hold a job for any length of time." **R. 299**.

Dr. Opaneye did not provide a formal opinion letter for consideration in Kuehl's disability adjudication, and his treatment notes contain no express conclusions with respect to Kuehl's specific work-related limitations.

## B. ALJ decision

In a decision dated July 22, 2016, ALJ William Leland determined that Kuehl had "moderate limitations" in activities of daily living, social functioning, and concentration, persistence, or pace, **R. 21**, but that she retained the RFC to perform a full range of work at all exertional levels with several nonexertional limitations. **R. 22**. Specifically, he found Kuehl limited to performing simple, routine and repetitive tasks, but not at a production rate pace (i.e., assembly line work); and he deemed Kuehl limited to simple work-related decisions in using her judgment and dealing with changes in the work setting. *Id.* He further determined that she could frequently interact with supervisors, coworkers, and the public. *Id.* Based on this RFC determination, the ALJ determined that there existed jobs in significant numbers in the national economy that the claimant could perform such that Kuehl was not disabled within the meaning of the Social Security Act. **R. 27**.

In reaching his conclusion, the ALJ did not credit all of Kuehl's testimony concerning the extent of her symptoms because he deemed her statements "not entirely consistent with the medical evidence and other evidence in the record." **R. 23**. Specifically, he noted that Drs. Cleve, Opaneye, and Cowan repeatedly describe Kuehl in mental status examinations as oriented to person, time, and place; as clear, lucid, and articulate; as having coherent, logical, goal-directed thought processes; as having functionally intact attention and concentration and

fair to good insight and judgment; as being well-groomed; and as lacking memory deficits or evidence of a thought disorder. **R. 24**. He also highlighted portions of the treatment notes that appear to cast Kuehl in a psychologically functional light, such as Dr. Cleve's note that Kuehl had lost 75 pounds, **R. 386**, and Dr. Cowan's note describing Kuehl as able to watch television shows on Netflix, make simple meals, do laundry, vacuum, and go to the store. **R. 280**.

As for the opinion evidence, the ALJ gave the opinions of the agency's reviewing psychologists, Dr. Rattan and Dr. Rozenfeld, "significant weight because they [were] consistent with the record as a whole." *Id.* He provided no further explanation. He gave the opinion of Dr. Cowan, the consultative examining psychologist, only "partial weight" because, although his findings were generally supported by his examination, "his opinion that the claimant has markedly or extremely impaired abilities to withstand work pressures appear[ed] to be based primarily on the claimant's self-reporting rather than an independent assessment." *Id.* The ALJ assigned Dr. Cleve's opinion "some weight as coming from a licensed mental health professional," but discounted it because "the severity he describe[d was] not supported by the claimant's mental status examinations." **R. 26**. Specifically, he noted that, although Dr. Cleve's progress notes "contain[ed] the claimant's subjective complaints of stress and anxiety," Dr. Cleve also "observed that the claimant is frequently in good spirits, and he consistently describes her as clear, lucid, and articulate." *Id.* He ascribed only "limited weight" to Dr. Renken's August 2013 recommendation that Kuehl take a three-week leave of absence from her job because it did not provide "a longitudinal assessment of the claimant's functional abilities."[4] *Id.* The ALJ did not assign a specific weight to Dr. Opaneye's treatment notes.

---

[4] Plaintiff does not challenge the weight accorded to Dr. Renken's opinion on appeal.

9

ANALYSIS

Both parties agree that Kuehl is significantly limited by her mental impairments. *See* Dkt. 12, at 17. Their primary point of contention is whether the ALJ's RFC determination is an accurate reflection of Kuehl's limitations. The parties identify two primary issues related to the RFC. First is whether the ALJ's decision to give the reviewing psychologists' opinions significant weight in determining the RFC while according the treating and examining source opinions reduced weight is supported by substantial evidence. Second is whether the ALJ adequately accounted for his conclusion that Kuehl had moderate limitations in concentration, persistence, and pace in his RFC determination.

The court reviews the final decision of an ALJ "to determine whether it applies the correct legal standard and is supported by substantial evidence." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the Commissioner's findings, the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility, or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). But neither can a district court simply "rubber stamp" the Commissioner's decision. *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992).

The court concludes that a remand is warranted in this case because the ALJ failed to provide sufficient explanation for his decision to accord greater weight to the agency's reviewing psychologists than to Kuehl's treating or examining medical providers—sources to whom the regulations ascribe presumptively greater weight. The ALJ further erred by failing to connect

the specific function limitations he included in Kuehl's RFC determination to evidence of limitations in concentration, persistence, and pace in the underlying record.

## A. Treating, examining, and non-examining source opinions

Kuehl contends that the ALJ's decision to privilege the opinions of non-examining sources over the opinions of treating and examining sources was not justified by good reasons or supported by substantial evidence. For claims filed before March 27, 2017, ALJs generally give more weight to the medical opinions of sources who have treated or examined the claimant than sources who have not. 20 C.F.R. § 404.1527(c)(1)-(2).[5] Indeed, the preference for treating source medical opinions under the regulations is so strong that "[a] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citing 20 C.F.R. § 404.1527(d)(2)). "An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010) (citing 20 C.F.R. § 404.1527(d)(2)).

The ALJ afforded the opinions of reviewing psychologists Drs. Rattan and Rozenfeld "significant weight" because he found them "consistent with the record as a whole." Yet both Rattan and Rozenfeld had access to only a small, now-outdated portion of the overall record in formulating their opinions. Dr. Rattan only had the 25 pages of medical records from 2012 and 2013 provided by Kuehl's primary care physician, **R. 69–70**, whereas Dr. Rozenfeld was limited to those records plus Dr. Cowan's report. **R. 78–81**. They issued their opinions in

---

[5] For claims filed after March 27, 2017, treating sources' opinions are not entitled to any specific evidentiary weight. *See* 20 C.F.R. § 404.1520(c).

December 2013 and June 2014, respectively, several months before Kuehl began longer term treatment with Drs. Cleve and Opaneye in October 2014. As a result, neither of the reviewing psychologist opinions takes the copious treatment records into account. Records from 18 months of mental health treatment, including detailed long-form notes, several objective psychological tests indicating instability and dysfunction, and numerous adjustments in medication, could affect the state agency reviewers' assessment of Kuehl's mental functional capacity. *See Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (criticizing ALJ's reliance on consulting physicians' conclusions that were based on incomplete medical record); *Campbell*, 627 F.3d at 309 (same). Because Drs. Rattan and Rozenfeld considered such a small portion of the record, the ALJ's conclusion that their opinions are "consistent with the record as a whole" is not supported by substantial evidence.

This in itself would be enough to require remand. But the ALJ's analysis of the more recent evidence in the record—particularly the opinion evidence of treating psychologist Dr. Cleve—is also deficient because it relies on cherry-picked evidence. *See Campbell*, 627 F. 3d at 306 ("An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability."). The ALJ justified his decision to reduce the weight given to Dr. Cleve's opinion by asserting that the "severity he describes [wa]s not supported by the claimant's mental status examinations" and noting that his progress notes described Kuehl as "frequently in good spirits" and "as clear, lucid, and articulate." **R. 26**. But a fair and complete reading of Dr. Cleve's treatment notes shows that, although Kuehl's mental status examinations were always within normal limits, other sections of his notes depict mounting instability and dysfunction. In particular, the extensive "History

of Present Illness" sections of his notes give the impression that Kuehl suffers from symptoms of serious mental illness.

Indeed, certain of the details selectively cited by the ALJ as evidence that Kuehl retains the ability to work actually cut the other way. For example, the ALJ notes that, in December 2014, Dr. Cleve described Kuehl as "somewhat anxious" but "doing relatively well." **R. 24**. The full quote from Dr. Cleve's notes reads: "*As usual, she seems somewhat anxious and a little disorganized* but seemed to be doing relatively well *today*." **R. 322** (emphasis added). The ALJ later cites a note in which Dr. Cleve mentions that Kuehl has lost 75 pounds on Weight Watchers by counting points and drinking large amounts of water, as if to imply that this is a sign of improved psychological functioning. **R. 24**. In fact, Dr. Cleve's note mentions this detail in the course of expressing his deepening concern for Kuehl's well-being. He states that Kuehl is "drinking about double [the amount of water that] she probably should be drinking" and "is not motivated in any other way," noting that she "does not exercise at all, sits on the couch all day, puts dishes in the dishwasher but lets her husband who works full-time wash the ones that do not go into the dishwasher, showers only about once a week and only brushes her teeth about every third day." **R. 386**. Such selective incorporation of record evidence is impermissible and undermines the ALJ's decision to accord Dr. Cleve's opinion reduced weight. *Yurt v. Colvin*, 758 F.3d 850, 859 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).

But beyond mere cherry-picking, the ALJ's analysis of the medical opinions fails to build a "logical bridge" between the evidence and his conclusions, which he was required to do. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). As explained above, the single reason provided by the ALJ for preferring the non-examining source opinions—consistency with the

13

record as a whole—is conclusory and ignores substantial portions of the record. The ALJ's explanation for discounting the opinion of Dr. Cleve—namely, that his records are internally inconsistent—is also insufficiently explained. Specifically, the ALJ fails to lay out with adequate clarity why Dr. Cleve's unremarkable mental status examinations of the plaintiff and his note that Kuehl frequently seems in good spirits necessarily undermine his overall conclusions concerning her mental limitations. After all, an individual's ability to comport herself normally during hour-long psychotherapy sessions or examinations does not necessarily lead to an inference that she has the functional capacity to work full-time. *See Gerstner v. Berryhill*, 879 F.3d 257, 262 (7th Cir. 2018) (ALJ erred by cherry-picking details from treating physician's "relatively normal mental status examinations" where "the affect and mood notes that the ALJ emphasized simply described how [the claimant] presented *on the days of her appointments*" and "were not general assessments" (emphasis in original)).

In her brief, the Commissioner puts a different gloss on the ALJ's analysis, arguing that the ALJ thought Dr. Cleve and examining physician Dr. Cowan "too credulous of Plaintiff's subjective statements." Dkt. 12, at 1. This is not an accurate characterization of the ALJ's reasoning.[6] Regardless, the mere fact that the ALJ found the plaintiff not fully credible, *see* **R. 23**, does not, without more, adequately justify discounting objective evidence of disability

---

[6] This characterization is arguably a permissible reframing of the ALJ's conclusion with respect to Dr. Cowan, whom the ALJ discounted for basing certain conclusions "primarily on the claimant's self-reporting rather than on an independent assessment." **R. 25**. It is not, however, an accurate characterization as to the ALJ's treatment of Dr. Cleve, whose opinion the ALJ discussed and discounted exclusively in terms of its alleged internal inconsistencies. **R. 26**. The Commissioner's argument that the ALJ found Dr. Cleve overly credulous of Kuehl therefore amounts to impermissible *post-hoc* rationalization. *See Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security benefits, as this court has noted repeatedly").

14

proffered by treating or examining sources. Here, Dr. Cleve offered evidence of disability in the form of psychological test results widely considered to be objective by mental health professionals. *See* Robert J. Craig, *Interpreting Personality Tests: A Clinical Manual for the MMPI-2, MCMI-III, CPI-R, and 16PF* 5 (1999) (describing the MMPI-2 and MCMI-III as two of the four "major objective personality tests currently in frequent use"). Although the ALJ makes a passing mention of Dr. Cleve's finding that "the claimant's personality testing was consistent with 'some type of schizophrenia'" in summarizing the various opinions, **R. 25**, he fails to account for those objective tests in his analysis.

As for Dr. Cowan, the ALJ partially discounted his opinion because it "appear[ed] to be based primarily on the claimant's self-reporting rather than on an independent assessment. The claimant's mental status examination did not reveal marked or extreme deficits." **R. 25**. Here too the ALJ's analysis is inadequate. The ALJ's opinion suggests that the mental status examination Dr. Cowan conducted was the primary basis for finding Kuehl only partially credible in her answers to Dr. Cowan's questions. But, for reasons discussed above, presenting unremarkably during a brief mental status examination is not sufficient to support the conclusion that a claimant is not credible in her self-reporting.[7] *See Gerstner*, 879 F.3d at 262. Further, the ALJ failed to explain at all how Dr. Cowan's assigning Kuehl a low GAF score of 49 would factor into his analysis.

---

[7] The court need not directly address questions of whether the credibility determination made by the ALJ is itself patently wrong, or whether, as the Commissioner argues, Kuehl waived the credibility issue by neglecting to challenge it head-on in her opening brief. *See* Dkt. 12, at 13 n.3. But on remand, it would be appropriate for the ALJ to take a fresh look at whether Kuehl's subjective symptoms are supported by the record.

Finally, as to the ALJ's treatment of Dr. Opaneye, the court agrees with the Commissioner that the ALJ did not err by failing to ascribe a particular weight to his treatment notes. Dkt. 10, at 21–26. Unlike the opinion information furnished by Drs. Rattan, Rozenfeld, Cowen, and Cleve, Dr. Opaneye's notes—though helpful in illustrating the extent of Kuehl's treatment—do not contain "medical opinions" within the meaning of 20 C.F.R. § 404.1527(a)(1). To qualify as a medical opinion, a statement must reflect a judgment about the nature and severity of the impairment, including symptoms, diagnosis, prognosis, what the claimant can still do despite the impairment, and any physical or mental restrictions. 20 C.F.R. § 404.1527(a)(1). Although Dr. Opaneye's notes discuss Kuehl's symptoms and diagnoses, they do not include a prognosis, a discussion of what Kuehl could do despite her impairments, or an assessment of her mental restrictions. *See Horr v. Berryhill*, No. 17-3300, 2018 WL 3634894, at *4 (7th Cir. July 31, 2018) (doctor's report of claimant's symptoms and diagnoses was not a medical opinion because it lacked a prognosis, a discussion of what the claimant could do despite her impairments, or an assessment of her physical restrictions).

Yet even though he need not have ascribed Dr. Opaneye's treatment notes a particular weight, the ALJ nevertheless erred by failing to account for how those notes informed his analysis. His summary of Dr. Opaneye's records is cursory and characterized by cherry-picking. For example, the ALJ mentions Dr. Opaneye's records of Kuehl's unremarkable mental status exams and a particular session during which she reported significant improvements in her mood, **R. 24**, but he fails to acknowledge the notes in which Dr. Opaneye documented Kuehl's persistent catastrophic preoccupations, experiences of thought blocking, or GAF score of 50–55. ALJs have an obligation to evaluate all relevant evidence, even when it is not presented in the form of a medical opinion. 20 C.F.R. § 404.1545(a)(3). He failed to do so here.

All told, the ALJ's decision to weight the medical opinions as he did was premised on an incomplete reading of the record—both on his own part and on the part of the reviewing sources on whom he placed significant weight. Indeed, the ALJ's decision to privilege the outdated and substantially incomplete opinions of Rattan and Rozenfeld over those of the treating and examining sources suggests that the ALJ considered actual face-to-face contact with the plaintiff a mark *against* them in considering the weight to accord their opinions. This turns the regulatory framework on its head. 20 C.F.R. § 404.1527(c) (medical opinions from treating and examining sources are generally favored over opinions from non-examining, non-treating sources). An ALJ may, of course, discount the opinions of treating and examining physicians in favor of non-examining sources, but he can expect "a reviewing court to take notice and await a good explanation for this unusual step." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014). He failed to provide adequate explanations here. On remand, the ALJ should reconsider the medical opinions (or seek supplemental opinions if necessary), and take care to provide specific, well-supported reasons for the weight he gives to each one.

### B. Concentration, persistence, and pace

Kuehl also contends that the ALJ erred by failing to incorporate his findings regarding her moderate limitations in CPP into the question he posed to the vocational expert (VE), which ultimately became the RFC. "In this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). This includes any deficiencies of concentration, persistence, or pace. *Id.*

In their briefs, the parties get into the weeds debating whether the hypothetical question the ALJ posed to the VE adequately incorporated specific limitations tailored to Kuehl's mental

impairments. But there is a more fundamental flaw in the ALJ's analysis. The ALJ ascribed significant weight to the reviewing psychologists' opinions in formulating his RFC assessment, a fact that the Commissioner says shows that the hypothetical question he posed to the VE gave a reasoned account of Kuehl's functional, work-related mental limitations. Dkt. 12, at 19–28. But the reviewing psychologists' opinions do not actually reflect the content of the ALJ's RFC determination at all. For example, Drs. Rattan and Rozenfeld both opined in their Mental Residual Functional Capacity Assessment that Kuehl was "[n]ot significantly limited" in her ability to make simple work-related decisions, **R. 73**, 85, yet the ALJ concluded Kuehl was "limited to simple work-related decisions" in his RFC assessment. Similarly, both psychologists stated that Kuehl was "[n]ot significantly limited" in her ability to complete a normal workday and workweek without interruptions from the psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. *Id.* Yet the ALJ's RFC determination notes that she can perform simple, routine, and repetitive tasks so long as they are "not at a production rate pace, i.e. assembly line work." It is unclear from where in the record the ALJ drew these limitations, or how they are tailored to Kuehl's specific functional impairments.

The mere fact that the ALJ made his determination more restrictive than the reviewing psychologists' assessments suggest does not insulate his RFC from challenge. *See, e.g., Collins v. Berryhill*, No. 1:17-cv-380, 2018 WL 1981104, at *12 (N.D. Ind. Apr. 27. 2018). Rather, the question is whether the RFC assessment finds a basis in the record. Here, neither the ALJ nor the reviewing psychologists on whom he relied identify with any specificity what Kuehl's function limitations are. There is no assessment of how long she can maintain concentration, how often she is off-task, or how quickly or slowly she can work. Because it is unclear where

the ALJ derived various elements of his RFC determination, it is not supported by substantial evidence. On remand, the ALJ should determine what Kuehl's precise function limitations are based on evidence in the underlying record before formulating the RFC.

## C. Instructions for Remand

On remand, the ALJ should analyze all medical opinions, using the § 1527(c) factors before assigning them a weight, and without dismissing or ignoring evidence that supports a finding of disability. This order does not mandate that the ALJ make any particular finding on remand. But the ALJ must adequately explain his ultimate decision using the proper framework. The ALJ must also formulate the RFC determination based on evidence in the underlying record.

ORDER

IT IS ORDERED that the decision of defendant Nancy A. Berryhill, Acting Commissioner of Social Security, denying plaintiff Christa Tama Kuehl's application for disability insurance benefits is REVERSED AND REMANDED under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

Entered September 17, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge